**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TINA LOUISE COOK, | ) | CASE NO. 1:12-cv-00249 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Defendant. | ) | |

This case is before the magistrate judge on referral.  Plaintiff, Tina Louise Cook ("Cook"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Cook's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the opinion of the Commissioner should be AFFIRMED.

## I.  Procedural History

Cook filed an application for SSI on June 11, 2008, alleging disability as of November 1, 2006.  In her application, Cook complained of disability due to mental illness.

Cook's application was denied initially and upon reconsideration.  She timely requested an administrative hearing.

Administrative Law Judge Edmund Round ("ALJ") held a hearing on November 17, 2010.  Cook, represented by counsel, testified on her own behalf.  Mark Anderson testified as a vocational expert ("VE").  The ALJ issued a decision on December 27, 2010, in which he determined that Cook was not disabled within the meaning of the Act.  Cook requested review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on December 15, 2011, the ALJ's decision became the final decision of the Commissioner.

Cook filed an appeal to this court on February 1, 2012.  Cook alleges that the ALJ erred because substantial evidence does not support (1) the ALJ's determination that Cook was less than fully credible and (2) the ALJ's determination that Cook was capable of simple, repetitive work.  The Commissioner replies that the ALJ's opinion is fully supported by substantial evidence.

## II.  Evidence

### A.    *Personal and Vocational Evidence*

Cook was born on October 30, 1967 and was 43 years old on the date of the hearing.  Cook has completed ninth grade and has past relevant work as a housekeeper and cleaner.  On her Work Activity Report, Cook stated the following regarding her last employment:

> I worked 40 hours per week for about 1 month after I started with Varsity Contractors.  I could not continue at 40 hours per week because of my medical condition, so I reduced my hours to 25-30 per week.  I finally had to stop working 4/10/2007 due to my condition.

2

Transcript ("Tr."), p. 146.

B.    *Medical Evidence*

On February 25, 2008, Cook visited University Hospitals Health Services, Case Medical Center ("UH") for a variety of ailments.  Tr. at 476.  Among other things, Cook reported that she had experienced a great deal of stress in her life recently, the result of financial, job, and legal issues and of her house being robbed.  The attending physician, Michael Chen, M.D., noted that Cook had spent some time in jail.  Cook reported depressed mood and energy, poor sleep, anhedonia, and some crying.  Cook denied suicidal or homicidal ideation.  Dr. Chen diagnosed somatic pain, probably resulting from tension or stress, and depression.  Dr. Chen prescribed Tylenol, fluoxetine (*i.e.*, Prozac), and increased exercise, with a follow-up in a month.

Cook saw Dr. Chen again at UH on March 26, 2008.  Tr. at 274-75.  Cook described herself as unemployed but looking for work, a smoker, and wanting to lose weight.  Cook continued to report depression, and Dr. Chen substituted bupropion (*i.e.*, Wellbutrin) for fluoxetine.

Researchers at UH interviewed Cook for possible participation in a research study on April 10, 2008, by telephone, and April 28, 2008, in person.  Tr. at 237-38.  Cook told the interviewers that she was tired, sad, emotional, and frustrated.  She rarely felt "up," and she was anxious more days than not over the last six months.  She stated that she had experienced mild depression before she was charged with drug trafficking in 2006 but that her serious problems with depression and anxiety began at that time.  The in-person interviewer described Cook as alert, co-operative, and pleasant, and well-oriented, with normal speech and good eye contact.  Her mood, however, was

3

depressed, although affect was appropriate.  Insight and judgment were fair, and

memory was "OK."  Tr. at 237.  She denied suicidal or homicidal ideation and

hallucinations.

On May 5, 2008, Cook reported to Dr. Chen that she was undergoing

considerable stress at home from finances, children, and housing and was unable fully

to comply with her bupropion regimen due to lack of money.  Tr. at 273.  Dr. Chen

modified her prescription to make compliance easier.  Cook reported continued stress

on August 12, 2008 and also reported headaches, probably from tension, on November

20, 2008.  Tr. at 269, 268.  Cook was counseled to talk to her therapist about increasing

her dosage of anti-depressant medication.

Psychologist David V. House, Ph.D., examined Cook and administered a mental

status examination on September 5, 2008 at the request of the Bureau of Disability

Determination ("Bureau").  Tr. at 242-48.  Cook described herself as never married and

experiencing depression most of her life after childhood.  She went to school up to 10th

grade, and her grades were poor.  Her longest period of employment was two years

with Service Master, ending in 1999.  Cook reported that she left Service Master

because of depression.  She also worked for a cleaning company for about a year but

left at the beginning of 2007 due to transportation difficulties.  She had a daughter and

three sons, ranging in age from 22 to 14.  Her arrest for drug trafficking in June 2007

resulted in the imposition of two years' probation.  At the time of the interview, Cook was

taking hydrochlorothiazide for hypertension, ranitidine for gastroesophageal reflux,

Prozac for depression, and ibuprofen.  She was in counseling with Sharon Coontz

through Catholic Charities.  Cook denied current illegal drug use, reporting that she had

4

last used marijuana six years earlier.  She also reported that she drank occasionally and had stopped smoking.  She said that she had applied for disability because she is stressed and irritable and has homicidal thoughts.

Cook told Dr. House that she was tired all the time and had trouble sleeping. She reported waking up twice during the night and sleeping on and off.  Cook said she had racing thoughts and was worried about violence in her neighborhood and the possibility of eviction in the near future.  She had been living out of her car for the past two weeks.  Cook reported that she found herself crying about twice a week, sometimes for no reason.  She also reported some compulsive behaviors and mood swings.

Cook described her daily activities as consisting largely of looking for a place to live, caring for her children, doing housework, and watching television.  Cook was able to cook, do laundry, clean, shop, and drive.

Dr. House reported that Cook's affect was flat and her manner subdued. Grooming and hygiene were adequate. He detected no loosening of associations or tangentiality in her speech, and her speech was understandable.  Eye contact was adequate, and thought content reasonably normal.  Dr. House described Cook's cognitive functioning as moderately limited in concentration and attention, slow in pace, and with poor persistence.  She performed serial three-subtraction  to a sequence of three digits and could recall two of three objects after five minutes. Memory for digits and computational skill were low average.  Fund of information was borderline to low average, and knowledge of current events was fair.  Insight and judgment were mildly limited.  According to Dr. House, "Her overall level of functioning is at a reduced level of efficiency."  Tr. at 246.  The validity of her scores on the Wechsler Adult Intelligence

5

Scale-III and Wechsler Memory Scale were clouded by her depression, with her evaluator opining that her intellectual functioning was in the low 80s and her memory functioning at least in the upper 70s.

In summarizing Cook's condition, Dr. House opined that Cook suffered from a moderate and recurrent major depressive disorder and an obsessive compulsive disorder, with both conditions chronic.  Concentration and attention were at least moderately limited due to depression; ability to understand and follow directions were not limited; ability to withstand stress was moderately limited due to depression; ability to relate to others and deal with the general public were moderately limited; level of adaptability was mildly to moderately limited; and insight and judgment were mildly limited.  Dr. House assigned Cook a Global Level of Functioning ("GAF") of 46.[1]

On September 23, 2008, state agency psychologist Mel Zwissler, Ph.D., reviewed Cook's record and completed a Mental Residual Functional Capacity ("RFC") Assessment Form assessing her condition.  Tr. at 249-62.  According to Dr. Zwissler, Cook's depression and anxiety with compulsive features were severe impairments, although they were not of sufficient severity to meet a listed impairment at 20 CFR Ch. III, Part 404, Subpart P, Appendix 1 ("the Listings").  Dr. Zwissler opined that Cook had moderate restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  He also found her to be moderately limited in her ability to do the following:

---

[1]  A GAF between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

6

maintain attention and concentration for extended periods; work in co-ordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  Dr. Zwissler found no other significant limitations.  Dr. Zwissler also reported that Cook's best friend stated that Cook has visions of killing neighbors, cares for her children and drives them to McDonalds, cooks simple meals, cleans and launders all day long, shops, manages her finances, can follow written directions, doesn't like change, and has not been the same since her arrest for drug trafficking.  Finally, Dr. Zwissler opined that although Cook was moderately limited in three of the four evaluative domains, she retained the ability to accomplish three- to four-step tasks, interact superficially, and adapt to explained changes.  He counseled against strict time pressures and ongoing interactions with the general public.

On December 23, 2008, Francis.G. Noviski, M.D., a psychiatrist at Catholic Charities, completed a Mental Status Questionnaire assessing Cook. Tr. at 288-90.  Dr. Noviski indicated that he first saw Cook on September 2, 2008 and last saw her on November 5, 2008.  According to Dr. Noviski, Cook's appearance was depressed and her mood, and affect depressed and anxious.  Cook experienced sleep disruption, loss of energy, and anhedonia.  She also had difficulties with concentration, and her insight was fair.  Dr. Noviski diagnosed Cook as having suffered from a major depressive disorder for more than a year.  Dr. Noviski opined that Cook had deficits in maintaining

7

attention and concentration; had marginal deficiencies in social interaction and adaptation; and would react poorly to pressures while involved in simple and routine or repetitive tasks.

Over the next several months, Cook reported varying moods to Dr. Noviski, depending upon medication and events.  On January 13, 2009, Cook told Dr. Noviski that she was feeling significantly better after her dosage of Prozac had been increased, although she also reported some mild fatigue.  Tr. at 363.  Cook was engaged in job hunting and had decided to get her GED.  On February 6, 2009 Cook reported problems with her cousin regarding Cook's planned move from her parents' house to her cousin's house  Tr. at 370.  On March 2, 2009, Cook told Dr. Noviski that she had been coping with a lot of stressors, including problems with her upcoming move and her financial situation.  Tr. at 368.  She also reported that her boyfriend was being moved from prison to a halfway house.  A week later, on March 10, 2009, Cook said that she was very happy about seeing her boyfriend, but mad and frustrated about her housing at the same time.  Tr. at 367.  On March 17, 2009, Cook reported doing well on Prozac.  On June 24, 2009, Catholic Charities discharged Cook from treatment after she failed to return following her April 6, 2009 session.  Tr. at 357.

Eulogio Sioson, M.D., examined Cook at the request of the Bureau on March 5, 2009.  Tr. at 309-14.  Cook reported problems with hypertension, headaches, and back, neck, and joint pain.  Cook told Dr. Sioson that her headaches began about four months earlier and that she had been having back, neck, and joint pain for about a year.  Cook described pain running from her right shoulder to her back and also pain in her left hip and left heel after walking a block, going up and down six steps, standing 1-2 hours, or

8

sitting for 3-4 hours.  According to Cook she was able to launder, vacuum, clean, cook,

wash dishes, and shop for groceries with the help of her children.  She was also able to

dress, groom, bathe, button, tie, and grasp, accompanied by pain in her shoulders and

tingling in heer hands and feet.  She rated her pain as eight on a scale of nine.  Dr.

Sioson recorded a three-year history of depression with suicidal thoughts, sleep

problems, tiredness, feelings of hopelessness, and memory and concentration

problems.  She though that her antidepressant medication helped.  Dr. Siosan detected

minimal back and neck tenderness and negative straight leg raising.  He found Cook to

be alert, coherent, and oriented, with no abnormal behavior or appearance.  Dr. Siosan

summarized his impressions as hypertension/headaches, neck/back/joint/pains,

depression without emotional lability or attention and concentration deficits, and

concluded as follows:

> Except for pain limitation and above findings, neuromusculoskeletal data
> showed no other objective findings that would affect work-related activities such
> as walking, climbing, standing, carrying, lifting, handling, sitting and traveling.
> Hearing and speaking should not be affected.

Tr. at 310.

Beginning April 30, 2009, Cook was treated at the Center for Families and

Children ("Center") because Catholic Charities was too far from her new housing.  Tr.

at. 351-54.  A preliminary diagnosis assessed Cook as suffering from a major

depressive disorder, recurrent generalized anxiety disorder, polysubstance

dependence, with hypertension, acid reflux, and headaches.  Aggravating social factors

included inadequate family support, minimal social support, no job or income, and legal

probation until February 2010.  Cook reported that she did not go out as much as she

9

had before 2007.  Cook reported suicidal and homicidal ideation and reported having

smoked marijuana just once in 1992.  The initial visit found Cook alert, coherent, and

oriented as to time, place, and person, but she also reported depression, hopelessness,

helplessness, pessimism, fatigue, and lack of interest and motivation.  The interviewer

found Cook's mood to be severely depressed and distractable but directable.  Insight

was fair, with judgment poor to fair.  Thought processes were concrete and intact.  Cook

was assigned a GAF of 45.

On May 28, 2009, Cook reported her mood as worsening because of life

stressors, and she reported trouble sleeping, worsening concentration, and mild

anhedonia.  Tr. at 349.  Cook said that she had suicidal thoughts but no suicidal

intention.

Cook failed to appear for scheduled appointments at the Center in July and

October.  A medical note on February 24, 2010 noted that Cook had been off her

medications for nine months due to poor follow-ups and missed appointments resulting

from lack of motivation and the feeling that medication was ineffective.  Tr. at 345.

Cook reported that she was feeling "mostly down," depressed, sad, experiencing fatigue

and low motivation, and suffering from crying spells and irritability.  She also admitted

paranoia but denied suicidal or homicidal ideation.  She reported alcohol use the

previous weekend.  Cook failed to appear for her appointment on March 17, 2010.  Tr.

at 343.

C.      *Hearing testimony*

At the November 17, 2010 hearing, Cook reported living with her two children but

having to move back and forth between her mother's house and her cousin's house

because permanent housing fell through.  Tr. at 26.  She testified that she could drive but that she no longer had a car because it had been repossessed.  Cook reported problems with her knee and wrist that limited her walking and lifting.  Tr at 27-29.  She took ibuprofen and Tramadol for her pain, both of which caused drowsiness and sleepiness.  Tr. at 29, 31.

Cook also testified that her depression and stress resulted in depressed mood, tiredness, a short attention span, and difficulties with unfamiliar situations.  Tr. at 29-31.  She was currently taking Prozac and Ativan for her depression.  Tr. at 31. She had done work as a housekeeper until 2007, but stress and pressures made the job impossible.  Tr. at 32.  She was eventually fired, according to Cook, because she had a disagreement with her manager.  Tr. at 32.  She reported that she was currently looking for a counselor to treat her condition.

Cook also testified that some days she was unable to cook or shop and that she felt this way "[l]ately a lot."  Tr. at 34.  According to Cook, her "mother pretty much keeps the house together."  Tr. at 34.  When she takes her medication she is drowsy, but when she does not take it, she suffers from headaches, tension, worry, and stress.  Tr. at 34.

In his hypothetical question to the VE, the ALJ asked the VE to consider a hypothetical individual of Cook's age, education, and work experience limited to performing simple, routine, low-stress tasks with no requirement for arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.  Tr. at 37-38.  Also, the individual could not have more than superficial interaction with supervisors, co-workers, and the public.  Tr. at 38.  When the

11

VE was asked if such an individual could perform any of Cook's past relevant work, the VE testified that the individual could perform such work.  Tr. at 38.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment

does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

In determining that Cook was not disabled, the ALJ made the following relevant findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since November 10, 2006, the alleged onset date.
>
> 3. The claimant has the following severe impairments:  a major depressive disorder and a generalized anxiety disorder.
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 5. The claimant retains the following residual functional capacity.  She has no exertional limitations.  She is limited to simple, routine, low-stress tasks and is precluded from tasks that require arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.  She is limited to no more than superficial interaction with supervisors, co-workers, and the public.
>
> 6. The claimant is capable of performing past relevant work as a housekeeper and a cleaner.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity.
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from November 10, 2006, through the date of this decision.

Tr. at 11-16 (citations omitted).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the

13

correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Cook alleges that the ALJ erred because substantial evidence does not support (1) the ALJ's determination that Cook was less than fully credible and (2) the ALJ's determination that Cook was capable of simple, repetitive work.  The Commissioner contends that substantial evidence fully supports the ALJ's decision.

A. *Whether substantial evidence supports the ALJ's determination that Cook was less than fully credible*

Cook argues that the ALJ found her to be less than fully credible on the basis of her missed treatment appointments.  According to Cook, because the reasons for these missed appointments do not, for the most part, appear in the record, these should not be held against her because there may have been good reasons for her absences.  In addition, Cook argues that because persons who suffer from mental illness typically display poor judgment, missing treatments should not be held against them.  Cook cites Ninth Circuit caselaw in support of this proposition.  The Commissioner responds that

14

the record as a whole supports the ALJ's opinion that Cook is less than fully credible.

Credibility determinations regarding a claimant's subjective symptoms rest with the ALJ.  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Nevertheless, social security regulations constrain the ALJ's analysis and determination of a claimant's credibility.  In particular, 20 C.F.R. § 416.929(a) and SSR 96-7p, 1996 WL 374186, describe a two-step process by which an ALJ must proceed in ascertaining the degree to which a claimant's statements about her subjective symptoms are credible.  *See also Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 246-47 (6th Cir. 2007).  First, an ALJ must determine whether the there is an underlying medically determinable physical impairment that could be expected to produce the claimant's alleged symptoms.  20 C.F.R. § 416.929(a); 96-7p, 1996 WL 374186 at *2.  Second, if the ALJ finds that the claimant suffers from an underlying impairment which could produce such symptoms, the ALJ must evaluate the actual intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*  In making this evaluation, the ALJ must consider the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms; and any

15

other factors bearing on claimant's limitations in performing basic functions.

The ALJ looked at almost all of the required factors in determining that Cook was less than fully credible.  The ALJ took note of Cook's failure to attend therapy sessions at Catholic Charities and the Center and asserted, "This brings into question both Mrs. Cook's commitment to treatment and her credibility regarding the severity of her symptoms."  Tr. at 15.  In addition, in determining Cook's residual functional capacity, the ALJ considered Cook's medications and their effects on her, medical professionals' impressions of Cook, and the opinions of non-examining, examining, and treating physicians.  He discounted the opinion of her treating physician, in part, because it did not accord with the weight of the evidence as a whole.  The ALJ also noted that Cook's subjective complaints included depressed mood, lack of interest, lack of motivation, irritability, anxiety, and a decrease in concentration.  In discussing Cook's contacts with various medical professionals, the ALJ noted Cook's self-reports of good and bad days and reports of the effects of life events and medications on her symptoms.  The ALJ then concluded:

> After careful consideration of the evidence, I have concluded that Ms. Cook's medically determinable impairments could reasonably be expected to cause the symptoms alleged, but that, for the reasons stated above, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with my residual functional capacity assessment.

Tr. at 15.

The one problem with the ALJ's determination is that the only place in his opinion where he examines Cook's activities of daily living is in his determination of whether Cook's condition meets or equals a Listing.  The entirety of the ALJ's examination of

16

Cook's activities of daily living was as follows:  "According to consultative examiner David House, Ph.D., Ms. Cook occasionally cooks, cleans, does laundry, and takes her children shopping and to the doctor."  Tr. at 12; *see also* tr. at 13 (repeating that Cook takes her children shopping and to the doctor).[2]

Nevertheless, while the ALJ's assessment of Cook's credibility is not perfect, it is supported by substantial evidence.  Cook frequently missed treatment appointments between January 2009 and March 2010, and the ALJ was entitled to draw the inference that Cook did not regard these treatments to be of great importance.  Cook explains that one of those appointments was the result of having a lot of things going on in her life and not having money for the parking meter the day of the rescheduled appointment. Plaintiff's Brief at 5.  Regardless of whether this is a satisfactory explanation, the record reflects that Cook missed eight appointments during this period.  *See* citations to the record in Defendant's Brief at 14.  Cook offers no explanation for the other seven missed appointments.  In addition, although the ALJ conflates his RFC and credibility assessments,[3] it is clear that one reason for the ALJ's finding that Cook is not fully credible is that her statements concerning the intensity, persistence, and limiting effects of her symptoms are inconsistent with the opinions of Drs. House and Zwissler.  Finally, during the RFC and credibility assessments, the ALJ noted that Cook was doing well on

---

[2]  While the ALJ draws no conclusions regarding credibility from Cook's daily activities, Cook's level of activity does demonstrate at least a moderate level of motivation and ability  to perform needed tasks.

[3]  At the conclusion of his combined assessments of Cook's RFC and credibility, the ALJ states, "[Cook's] statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with my residual functional capacity assessment."  Tr. at 15.

her medication.  These observations are sufficient to support the ALJ's assessment of

Cook's credibility, particularly given the special deference that this court must give an

ALJ's credibility determinations.[4]  Cook's arguments to the contrary, therefore, are not

well-taken.

B.     *Whether substantial evidence supports the ALJ's determination that Cook is*
       *capable of simple, repetitive work*

       Cook argues that substantial evidence does not support the ALJ's determination

that Cook is capable of simple, repetitive work because the ALJ improperly failed to give

controlling weight to the contrary opinion of Cook's treating physician.  The

Commissioner replies that the ALJ acted properly in failing to give controlling weight to

the treating physician's opinion.

       The medical opinion of treating physicians should be given greater weight than

those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and*

*Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about

the nature and severity of a patient's impairments, including symptoms, diagnosis,

prognosis, what a patient can still do despite impairments, and a patient's physical or

mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the

treating physician's opinion is based on sufficient objective medical data and is not

contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3),

416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370

---

       [4]  The court also notes that plaintiff does not explain how the ALJ's assessment of
Cook's RFC would have been different had he found Cook to be fully credible.  Cook fails
to demonstrate, therefore, that the ALJ's alleged error made a difference to the outcome
of the disability determination.

& n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).  The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

In the present case, the ALJ wrote as follows in discounting Dr. Noviski's opinion that Cook would react poorly to pressures while involved in simple and routine or repetitive tasks:

> In his December 23, 2008 report, he opined that Ms. Cook had a marginal deficiency with social interaction and adaptation.  In his opinion, Ms. Cook would react poorly to work pressure involved in simple, routine, and repetitive tasks. Despite the fact that Dr. Noviski is a treating physician, I afford his opinion little weight, as it is not consistent with the weight of the evidence.  Contrary to his opinion, Ms. Cook is doing well on her medication, despite her non-compliance with scheduled appointments.

Tr. at 15.  The ALJ, therefore, articulated a legitimate reason for rejecting the opinion of Dr. Noviski regarding Cook's ability to perform simple, repetitive, and routine tasks.

Cook argues that because the ALJ failed to reject Dr. Noviski's diagnostic techniques, the ALJ's opinion was deficient.  As Dr. Noviski failed to describe his diagnostic techniques, or describe any other reason for reaching his opinions, this criticism goes to Dr. Noviski's opinion, not the ALJ's.  Indeed, Dr. Noviski even failed to give examples which would have supported his clinical conclusions, as requested on the Mental Status Questionnaire.  It is worth noting, moreover, that at the time Dr. Noviski

19

gave his opinion, he had been treating Cook for only two months.  Thus, his clinical experience with Cook at the time he gave his opinion was limited.

Cook also argues that the ALJ erred in accepting the opinion of Dr. Zwissler, who rendered his opinion on September 23, 2008 and did not have the entire record before him, as did Dr. Noviski.  Dr. Noviski rendered his opinion on December 23, 2008.  Cook does not explain how anything occurring in the three months between Dr, Zwissler's opinion and Dr. Noviski's rendered Dr. Zwissler's opinion obsolete.  Thus, Cook fails to explain why any records not before Dr. Zwissler could have had any effect on his opinion.

The ALJ gave a legitimate reason for rejecting the opinion of Cook's treating physician regarding her ability to perform simple, repetitive, and routine tasks.  Cook's objections to that reason lack merit.  For this reason, Cook's argument that substantial evidence does not support the ALJ's opinion in this respect is not well-taken.

VII.  Conclusion

For the reasons given above, the decision of the Commissioner should be AFFIRMED.


Date:  September 26, 2012            *s/ Nancy A. Vecchiarelli*
                                    Nancy A. Vecchiarelli
                                    U.S. Magistrate Judge


## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the**

specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.